IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CITY OF GREENSBORO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:15-CV-559 |
| | ) | |
| GUILFORD COUNTY BOARD OF ELECTIONS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In early July 2015, the North Carolina General Assembly passed a law that restructures both Greensboro city elections and the form of Greensboro city government. Many changes will take effect for the upcoming 2015 municipal elections, and others will go into effect in December 2015. The City of Greensboro and six of its citizens have filed suit, contending that the law violates their equal protection rights under the United States Constitution and the North Carolina Constitution.

The case presents two issues in the long run:

- Under what circumstances, if any, does the General Assembly's decision to treat one municipality and its voters differently from all other municipalities and their voters in connection with referendum rights and local control over form of government, number and boundaries of districts, method of electing council members, and style of elections violate the Equal Protection Clause?

- Did the General Assembly violate the "one person, one vote" principles of the Equal Protection Clause by the way it redistricted and reapportioned the eight Greensboro City Council seats?

In the short run, the question before the Court today is whether the Court should enjoin the Guilford County Board of Elections from holding the 2015 municipal elections in conformity with the new statute in order to prevent irreparable harm to the plaintiffs caused by these alleged equal protection violations.

It appears on the current record that the new statute deprives Greensboro voters, alone among municipal voters in the State, of the right to change the City's municipal government by referendum and otherwise treats the City of Greensboro and its voters differently from all other municipalities and municipal voters, without a rational basis. Therefore, the plaintiffs are likely to prevail on the merits. The plaintiffs would suffer irreparable harm should the 2015 election go forward under the new law, and the public interest and the equities favor a return to the pre-existing status quo pending resolution of this lawsuit. The Court will grant the plaintiffs' motion for preliminary injunction.

## BACKGROUND[1]

In early July 2015, just days before the filing period for the 2015 Greensboro City Council election was scheduled to open, the North Carolina General Assembly passed

---

[1] Findings of fact pursuant to Rule 65 of the Federal Rules of Civil Procedure are made throughout this opinion. All findings of fact are made for purposes of the pending motion only and are based on the evidentiary record as it currently stands.

House Bill 263, referenced here as Session Law 2015-138 or the Act.[2]  The Act makes changes both to the way the City Council will be elected in 2015 and to the City's governmental structure, including redistricting all eight City Council seats and reducing the power of the Mayor.  The Act also withdraws from the City of Greensboro and its voters certain statutory rights available to all other municipalities and municipal voters statewide; these include the right of a city council to change its structure, *see* N.C. Gen. Stat. § 160A-102, the right of voters to reject such a restructuring through a referendum, *see id.* § 160A-103, and the right of voters to initiate such a restructuring through a referendum.  *See id.* § 160A-104.

In 1969, the General Assembly adopted the statute now codified at N.C. Gen. Stat. § 160A-101 *et seq.*, which delegates to all cities, towns, and villages significant control over their own forms of government.  Under Chapter 160A, every North Carolina municipality and its voters have the right to select the structure and form of the municipality's government.  *See generally id.* § 160A-101 *et seq.*  Section 160A-101 allows every North Carolina municipality to adopt or alter its name, *id.* § 160A-101(1); to select the style of the municipal corporation and its governing board, *id.* § 160A-101(2); to decide the number, terms of office, and mode of election of council members, *id.* § 160A-101(4)-(6); to select the method of conducting municipal elections, *id.* § 160A-101(7); to determine the method of selecting the mayor, *id.* § 160A-101(8); and to decide

---

[2] The Act is entitled "An Act to Modify the Form of Government in the City of Trinity and to Clarify the Form of Government, Method of Election, and Determination of Election Results in the City of Greensboro."  (Doc. 1-1 at 2.)  The pending motion does not address the aspects of the Act related to the City of Trinity.

Case 1:15-cv-00559-CCE-JLW   Document 35   Filed 07/23/15   Page 3 of 21

the form (mayor-council or council-manager) of municipal government. *Id.* § 160A-101(9). It also requires a city council to draw the boundaries of any districts and to apportion those districts. *Id.* § 160A-101(6).

Under Chapter 160A, each city council is authorized to change from one of the options identified in § 160A-101 to another by means of an ordinance amending the city's charter, subject to compliance with a number of notice and procedural requirements, including a public hearing. *See id.* § 160A-102. Every council is permitted, but not required, to condition adoption of such an ordinance on approval by the people. *See id.* If a council chooses to proceed with a vote by the people, a special election on the ordinance must be held no less than 70 days after the ordinance is adopted. *See id.*

If a city council enacts such a change without approval by a vote of the people, public notice of the enactment is required. *See id.* In every municipality, any change made without voter approval is subject to a referendum if the required number of voters submit a timely petition. *See id.* § 160A-103. If a petition meeting the numerical requirements is presented to the council within 30 days of public notice, every council must submit its proposed change to a referendum before it can go into effect. *See id.*

Each city's municipal voters themselves are also authorized to initiate changes to city governance by referendum. *See id.* § 160A-104. Chapter 160A imposes certain numerical and procedural requirements for such petitions, but the subject matter of a referendum petition can cover any topic set forth in § 160A-101, except for drawing district boundaries. *See id.* § 160A-101(6) ("An initiative petition may specify the

4

number of single-member electoral districts to be laid out, but the drawing of district boundaries and apportionment of members to the districts shall be done in all cases by the council."); *id.* § 160A-104 ("The [initiative] petition shall set forth the proposed amendments by describing them . . . with reference to the pertinent provisions of [N.C. Gen. Stat. §] 160A-101 . . . ."). Upon receipt of a referendum petition, a council must call a special election to consider the proposed changes. *See id.* § 160A-104.

Since 1983, Greensboro has chosen, pursuant to Chapter 160A, to use the Mayor-Council form of government, with the Mayor and three council members elected at-large and five council members elected from single-member districts. (Doc. 34 at ¶ 7.) All council members and the Mayor are elected to two-year terms. (*See* Doc. 34 at ¶¶ 2, 8.) Elections are held in odd-numbered years, *see generally* N.C. Gen. Stat. § 163-279, with the Mayor and all council members on the ballot each election.[3] Since 1973, the City has used a primary/election method for selecting City Council members, by which a primary is held in October followed by a general election in November between the two candidates who received the most votes in the primary. (*See* Doc. 34 at ¶ 16); *see also* N.C. Gen. Stat. § 163-294(b).

Before passage of the Act, no aspect of Greensboro's governance and electoral system was under challenge. One referendum was scheduled, which was initiated by the City Council to change council member terms from two years to four years. (Doc. 33 at

---

[3] For a history of municipal elections in North Carolina, *see* Robert Joyce, *Municipal Elections–Odd Year and Odd Man Out*, Coates' Canons: N.C. Local Government Law (July 7, 2015), http://canons.sog.unc.edu/?p=8154.

¶ 8; *see also* Doc. 1 at ¶ 40.)  The filing period for the 2015 municipal elections was scheduled to open on July 6 and close on July 17.  (Doc. 24-3 at 2.)

The Act made many changes to the City's governmental structure and elections process.  The Act changes the terms of office for City Council members and the Mayor from two years to four years.  (Doc. 1-1 at § 2.(c)); *see also* N.C. Gen. Stat. § 160A-101(4), (8).  It changes the mode of election of the City Council from three at-large districts and five single-member districts to eight single-member districts, and it sets the boundaries for those new single-member districts.  (Doc. 1-1 at § 2.(c)); *see also* N.C. Gen. Stat. § 160A-101(6).  It changes the form of elections from nonpartisan primary and election, *see* N.C. Gen. Stat. § 163-294, to nonpartisan election and runoff election.[4] (Doc. 1-1 at § 2.(f)); *see also* N.C. Gen. Stat. §§ 160A-101(7), 163-293.  The Act made these changes effective for the 2015 municipal elections and delayed the filing period, which was originally set to run from July 6 through July 17, to July 27 through August 7. (Doc. 1-1 at § 3; *see also* Doc. 24-3 at 2.)

The Act also requires the City to operate under the Council-Manager form of government.  (Doc. 1-1 at § 2.(a)); *see also* N.C. Gen. Stat. § 160A-101(9)(a), (b).  The Act limits the Mayor's voting rights, allowing the Mayor to vote in City Council matters only when there is a tie and in certain employment-related matters.  (Doc. 1-1 at § 2.(d), .(e)); *see also* N.C. Gen. Stat. § 160A-101(8).

---

[4] Under the election/runoff system, any candidate receiving more than 50% of the total votes cast during the October election wins and the November election is used only when one candidate did not receive such a majority.  *See* N.C. Gen. Stat. § 163-293.

6

Finally, the Act prohibits the City of Greensboro and its voters from making changes to the form or structure of city government. (*See* Doc. 1-1 at § 2.(b) ("Notwithstanding Part 4 of Article 5 of Chapter 160A of the General Statutes . . . , the City of Greensboro shall not alter or amend the form of government for the City.")); *see also* N.C. Gen. Stat. § 160A-101 ("Any city may change its name or alter its form of government by adopting any one or combination of the options prescribed by this section . . . ."). This prevents the City Council from changing anything about its election process or the Mayor's voting rights, and it prevents the City from acting on any petition from Greensboro voters seeking either a referendum on any or all of the changes made by the legislature or from making any changes at all in governmental form. *See* N.C. Gen. Stat. §§ 160A-102 to -104.[5]

By its express terms, all of these changes applied "only to the City of Greensboro" and to no other municipality. (Doc. 1-1 at § 2.(g) ("This section applies only to the City of Greensboro.").) While the General Assembly has from time to time redistricted and reapportioned other cities and boards, nothing before the Court indicates that the General Assembly has ever before prohibited a municipality's voters from participating in the referendum rights given in N.C. Gen. Stat. §§ 160A-103 and 160A-104 or that it has ever before completely removed city governance choices from a city council.

---

[5] While the Act itself does not mention referenda or petitions for referenda, it explicitly states that "the City of Greensboro shall not alter or amend the form of government for the City." (Doc. 1-1 at § 2.(b).) This cannot be read to allow referenda under the North Carolina General Statutes, *see* N.C. Gen. Stat. §§ 160A-103, -104, the purpose of which is to make such changes, and, in any event, petitions for referenda require action by the City Council to be implemented. *See id.* §§ 160A-103, -104.

## LEGAL CONTEXT

Under the North Carolina Constitution, cities and counties are essentially creatures of the state. *See* N.C. Const. art. VII, § 1. Article VII gives the General Assembly the power to "provide for the organization and government and the fixing of boundaries of counties, cities and towns." *Id.* Cities have only the "powers and duties" that the General Assembly "deem[s] advisable." *Id.* In other words, "[m]unicipalities have no inherent powers; they have only such powers as are delegated to them by legislative enactment." *In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 16-17, 249 S.E.2d 698, 707 (1978); *City of Asheville v. State*, 192 N.C. App. 1, 20, 665 S.E.2d 103, 119 (2008).

On the other hand, the General Assembly cannot exercise its power over cities in a manner prohibited by the North Carolina Constitution. *See, e.g.*, *Martin v. Bd. of Comm'rs of Wake Cnty.*, 208 N.C. 354, 180 S.E. 777, 783 (1935) (noting that local governments "are subject to almost unlimited legislative control, except where this power is restricted by constitutional provision"). For example, all laws enacted by the General Assembly are subject to the Equal Protection Clause of the United States Constitution. *E.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (noting that "the purpose of the equal protection clause . . . is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination," including that caused "by [the] express terms of a statute") (internal alteration and quotation marks omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

8

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Martinez v. RegisterFly, Inc.*, No. 1:07CV00188, 2007 WL 1028516, at *1 (M.D.N.C. Mar. 21, 2007) (opinion and recommendation of Sharp, M.J.) (applying the preliminary injunction standard to a motion for a temporary restraining order). "A preliminary injunction is an extraordinary remedy afforded prior to trial" that temporarily provides "the relief that can be granted permanently after trial." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). The plaintiff bears a "heavy burden in showing [a] likelihood of success" where the area of the law at issue is "difficult and complicated" and "still developing." *Id.* at 349.

The Court has subject matter jurisdiction as the case raises federal questions. *See* 28 U.S.C. § 1331. While it is possible that all required parties have not been joined, as the defendant suggests, that possibility is either not strong, *see Wright v. North Carolina*, 787 F.3d 256, 261-64 (4th Cir. 2015), or joinder is unlikely to be feasible. Moreover, the Attorney General, who would likely represent any such required parties, is aware of this lawsuit and, to date, has declined to participate. This uncertainty does not preclude preliminary relief.

## ANALYSIS

The plaintiffs allege that the Act violates the equal protection clauses of the United States Constitution and the North Carolina Constitution. (Doc. 1 at ¶ 1.) They contend that the Act violates their equal protection rights in two different ways.

9

First, they assert that the Act violates their equal protection rights by prohibiting Greensboro and its voters from exercising local control over their form of government, either through the City Council or through the voters by referendum, while giving that right to all other municipalities in the State. (*See* Doc. 1 at ¶¶ 66-73.) Second, they contend that under the redistricting and reapportionment required by the Act, the votes of some voters will get significantly more weight than others, in violation of the equal protection guarantee of "one person, one vote." (*See* Doc. 1 at ¶¶ 74-82.)

## A. Removing Local Control and Referendum Rights

### 1. Likelihood of Success on the Merits

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The equal protection requirement "does not take from the States all power of classification," *Pers. Adm'r v. Feeney*, 442 U.S. 256, 271 (1979), but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

"[T]he Equal Protection Clause of Article I, § 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." *White v. Pate*, 308 N.C. 759, 765, 304 S.E.2d 199, 203 (1983). The North Carolina Constitution also provides the same "equal right to vote" guaranteed by the United States Constitution. *See id.* at 769, 304 S.E.2d at 205.

10

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If the plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*; *accord Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002). "Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Id.* at 731 (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)).

Under the Act, Greensboro voters, unlike all other municipal voters in the State, will elect their council members under a system that was never subject to the possibility of review by referendum, and they will be unable to change that system going forward. *See* discussion *supra*. While citizens do not have a fundamental constitutional right to initiate a referendum, *see Kendall v. Balcerzak*, 650 F.3d 515, 522-23 (4th Cir. 2011), "if a state chooses to confer the right of referendum to its citizens, it is obligated to do so in a manner consistent with the Constitution." *Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir. 2009) (internal quotation marks omitted); *see generally Meyer v. Grant*, 486 U.S. 414 (1988). Because the Act withdraws the statutory right to petition for a referendum from voters in the City of Greensboro, alone among North Carolina municipalities, it cannot survive constitutional scrutiny unless there is a rational basis for distinguishing

11

between Greensboro voters and voters in every other North Carolina municipality. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1209-13 (10th Cir. 2002).

The statute itself is silent as to the General Assembly's motivation or purpose and does not put forth any reasons for treating Greensboro and its voters differently from all other municipalities and municipal voters in the State. No explanation or rational reason based on a valid state interest for this different treatment appears on the record. The Attorney General was given notice of the lawsuit and the briefing and evidentiary schedule in connection with the plaintiffs' motion and has offered no state interest that is protected or promoted by excluding Greensboro and its voters from rights given to other municipal voters.

The prohibition against voter referenda is part and parcel of a larger statutory scheme that treats Greensboro voters differently. All other voters in municipalities in North Carolina have the right to have decisions about whether and how council districts are reapportioned, term lengths, and election methods made by persons who are elected locally. All other voters in towns and cities in North Carolina have the right to public notice and a hearing before council districts are revised, terms are changed, or the mayor's powers restricted. Greensboro's voters had these rights before the Act was adopted but will no longer have these rights under the Act.[6]

---

[6] While earlier versions of the Act contained some of the changes ultimately enacted, none contained the change to eight single-member districts adopted by the Act. Greensboro's voters had no opportunity to comment on the specifics of the eight single-member districts before the Act was adopted, which would not have been the case had the Greensboro City Council made the

The Act also treats the Greensboro City Council differently from all other municipal councils in the State. As noted *supra*, before the Act, the Greensboro City Council, along with every other municipal council in the State, had the right to amend its own charter to select different terms of office and whether those terms all expire at once or at different times, and to change the number of council members, the mode and format of elections, and the form of government, among other things. *See* N.C. Gen. Stat. § 160A-101. The Greensboro City Council, like all other municipal councils, had the responsibility to draw all district boundaries and to apportion members to each district. *See id.* § 160A-101(6). As a result of the Act, the City of Greensboro alone no longer has these rights and responsibilities.

The Supreme "Court has firmly established the principle that the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). In determining whether a distinction is minor or invidious, courts consider, among other things "the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Id.* (footnote omitted).

Here, the General Assembly passed the Act on the eve of the filing period with no advance notice of the boundaries of the reapportioned districts, there is no evidence of a

---

change pursuant to Chapter 160A. *See* N.C. Gen. Stat. § 160A-102; *see also id.* §§ 160A-103, -104.

legitimate state interest that is protected by treating the City of Greensboro and its voters differently from all other municipalities and municipal voters in the State, and Greensboro voters are disadvantaged by the State's classification of them as unentitled to the referendum protections given to other municipal voters. With no rational basis, and especially when considered in light of the significantly different treatment above and beyond the referendum issue, this unequal treatment of Greensboro voters likely violates their equal protection rights.

The result in *Palisade* supports this conclusion. *See Save Palisade FruitLands*, 279 F.3d at 1213-14. In that case, the court found no equal protection violation in a Colorado statutory system that gave referendum rights to voters of some counties and not to others. *Id.* at 1207-14. There, however, all counties could obtain the status that would allow for referendum rights by going through procedural requirements indicating voter support. *Id.* at 1208. That is not the case here, where the Act itself prohibits the City of Greensboro and its voters from exercising the statutory rights given to all other municipalities and municipal voters in the State and provides no mechanism for restoring those rights. Moreover, the legitimate interests advanced by the statute at issue in *Palisade* were to "facilitat[e] a broader degree of powers [by counties] and enhanc[e] local autonomy," *id.* at 1214, and those interests are not met here by depriving Greensboro voters, and Greensboro voters alone, of referendum rights.

In the non-legislative context, courts have held that a desire to experiment with different election formats provides a sufficient rational basis to support treating some local entities differently from others. *See, e.g., Sailors v. Bd. of Educ. of Cnty. of Kent*,

387 U.S. 105, 110-11 (1967); *see also White*, 308 N.C. at 769-70, 304 S.E.2d at 206. Here, however, the General Assembly did not require Greensboro to adopt a totally new election system not available to other cities; it chose one of the "old standbys" that was available for years to all municipalities. Thus the "desire to experiment" does not appear to provide a rational explanation for the General Assembly's decision to treat Greensboro and its voters differently from other municipalities and municipal voters.

The plaintiffs have shown a likelihood of success on the merits as to their claim that the Act violates the Greensboro voters' equal protection rights by depriving them of referendum and other local control rights given to all other municipal voters in the State, without a rational basis for that unequal and discriminatory treatment.

### 2. Irreparable Harm

The primary right at issue here is the equal right to initiate referendum elections, which is closely tied to the right to vote. Voting cases shed light on the nature of the injury here because the effect of the Act is similar: it deprives Greensboro voters of the right to vote on the way they select City Council members by depriving them of referendum rights available to every other voter in every municipality in the State. In voting cases, restrictions on the right to vote are routinely found to cause irreparable injury. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *cf. Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *United States v. West Virginia*, No. 2:14-27456, 2014 WL 7338867, at *5 (S.D. W. Va. Dec. 22, 2014).

Absent injunctive relief, the filing period for the 2015 election will open Monday, July 27, 2015, and candidates will file to run for the City Council with eight, not five, single-member districts and no at-large members and without allowing Greensboro voters any opportunity for recourse to a local referendum. The election will occur in the fall of 2015 under a new general election/runoff election system selected by the General Assembly and not subject to oversight by local voter referendum. Council members will be elected to four-year terms as ordained by the General Assembly instead of the two-year terms previously set by local decision, again without recourse to a referendum. Unlike voters of every other municipality in the State, Greensboro voters will elect their city council members under a new system established by the General Assembly that was adopted without notice to local voters and without giving local voters the right to disapprove of that system by referendum. In addition, Greensboro voters will be prohibited from considering by referendum a recommendation made by the City Council to change council members' terms from two-year terms to four-year terms.

Just as in voting cases, if the Court does not enter an injunction, it would mean that the City Council would be elected in a manner that is likely to be unconstitutional, to the harm of individual voters. If no injunction is entered and the plaintiffs ultimately win, the plaintiffs will have been deprived of their equal protection rights during the 2015 election cycle. That is not a deprivation that can be remedied. Moreover, all Greensboro citizens will have been governed, at least for a time, by a City Council that was elected in violation of equal protection requirements and by the only City Council in the state that was elected through a system and process established without local participation or

16

oversight.  That, too, is a wrong that cannot be remedied.  There are no claims by any plaintiff for monetary damages, which, even then, could not make the individual plaintiffs whole.

In *Republican Party of North Carolina v. Hunt*, 841 F. Supp. 722 (E.D.N.C. 1994), the district court explained:

> Should the interim relief that plaintiffs now request be denied and plaintiffs ultimately prevail on the merits at trial, plaintiffs will endure unnecessary harm due to the unavailability of prompt relief at that time.  . . .  A victory on the merits by plaintiffs would require the court either to nullify the elections that had already taken place and thereafter order new elections at considerable cost and time to the public and to all involved, or to bring the campaigns then in process to a staggering halt . . . .

*Hunt*, 841 F. Supp. at 728.

The plaintiffs have met their burden of showing irreparable harm if the Court does not grant their motion for preliminary injunction.

### 3.  Balance of the Equities and the Public Interest

For years, sections 160A-102 and 160A-103 of the North Carolina General Statutes have provided an orderly process for changes to municipal council districts and other aspects of council elections and required notice and time before these changes are passed and implemented.  *See* discussion *supra*.  There is little harm to anyone from delaying implementation of the Act to place it on a schedule more akin to the schedule of changes applicable to all other municipal election systems and methods in the State.  *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) (noting, in a different context, the problems caused by last-minute changes to elections).  The public interest is served by holding the 2015 elections according to a long-established system, as to which there

17

has not been a constitutional challenge, rather than a system that poses serious constitutional concerns and that was enacted just days before the filing period was to open. *See Hunt*, 841 F. Supp. at 728.

### 4. Conclusion

The plaintiffs have shown a likelihood of success on the merits and irreparable harm. The balance of equities and the public interest favor an injunction. The Court will grant the plaintiffs' motion for a preliminary injunction.

### B. Redistricting

In *Reynolds v. Sims*, 377 U.S. 533 (1964), the Supreme Court held that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." *Reynolds*, 377 U.S. at 560-61. The Court held that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. In *Avery v. Midland County*, 390 U.S. 474 (1968), the Court held that these protection rights extend to elections of local government officials. *See Avery*, 390 U.S. at 479.

Members of the Greensboro City Council are individuals selected by popular election to perform governmental functions. Therefore, the one person, one vote requirements of the Equal Protection Clause apply to the redistricting undertaken by the General Assembly in the Act. *See id.* This means that elected representatives such as those in the City Council districts here "should represent roughly the same number of

18

constituents, so that each person, whether or not they are entitled to vote, receives a fair share of the governmental power, through his or her representative." *Daly v. Hunt*, 93 F.3d 1212, 1226 (4th Cir. 1996).

The starting point in these cases is the maximum deviation from the ideal population differential between districts. As explained by the Fourth Circuit:

> If the maximum deviation is less than 10%, the population differential will be considered *de minimis* and will not, by itself, support a claim of vote dilution. If the maximum deviation is greater than 10%, it is *prima facie* evidence of a one person, one vote violation, and the state must justify the population disparity by showing a rational and legitimate state policy for the districting plan.

*Id.* at 1217-18 (footnotes, citations, and quotation marks omitted); *see also Wright*, 787 F.3d at 264.

"The 10% threshold does not, however, 'insulate' a state or local districting plan from attack." *Wright*, 787 F.3d at 264. If a plaintiff can "produce further evidence to show that the apportionment process had a taint of arbitrariness or discrimination," then the plaintiff can prevail. *See id.* (quotation marks omitted); *see also Williams*, 393 U.S. at 30 (noting the importance of "the facts and circumstances behind the [election] law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification"); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1337-38 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) (holding that deviations unsupported by "legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings . . . cannot withstand constitutional scrutiny").

19

Here, the plaintiffs concede that the deviation at issue is less than 10%. They have offered evidence that there are numerous other circumstances demonstrating that the purpose, intent, and effect of the Act is to deprive Greensboro voters of the right to have their votes counted equally. The Court is continuing to evaluate whether the plaintiffs have met the requirements of Rule 65 as to this claim.

### C. Conclusion

The Act adopts a comprehensive system for elections and governance in the City of Greensboro that treats the City and its voters differently from all other municipalities and municipal voters in the State. In other words, as to the sections applicable to Greensboro and its voters, the Act is all of a piece. No one has suggested any practical way that parts of the Act could be enforced while other parts are enjoined. It should be enjoined in its entirety.

In terms of preliminary remedy, one option would be to hold over all incumbents on the City Council pending a final decision. That option, however, would deprive Greensboro voters of the right to elect new Council members in 2015. The better option is to return to the previous system, which has been in place for some years and has not been challenged on constitutional grounds.

The previously scheduled referendum would place before the voters a change to four-year terms. (*See* Doc. 34 at ¶ 8.) That change is also contained in the Act. No party has suggested nor does the Court see any reason why that referendum cannot proceed on the ballot as originally scheduled.

For the reasons stated, it is **ORDERED** that:

1. The Motion for Preliminary Injunction, (Doc. 7), is **GRANTED** to the extent stated herein;

2. The Court reserves ruling on the motion, (Doc. 7), to the extent it is based on the one person, one vote claim;

3. The Court will enter a separate Order enjoining enforcement of the Act as to the City of Greensboro by the defendant;

4. The Motion for Temporary Restraining Order, (Doc. 3), is **DENIED** as moot.

This the 23rd day of July, 2015.

UNITED STATES DISTRICT JUDGE