IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CITY OF GREENSBORO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:15-CV-559 |
| | ) | |
| GUILFORD COUNTY BOARD OF ELECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In 2015, the North Carolina General Assembly passed a law that, among other things, prohibited the citizens of Greensboro, alone among municipal citizens in the state, from participating in municipal initiatives or referendums.[1]  The City of Greensboro and several individual residents of Greensboro sued, challenging the law on several grounds, including a claim that this ban violates their equal protection rights.

The plaintiffs moved for judgment on the pleadings on this claim.  The defendant, the Guilford County Board of Elections, takes no position on the constitutionality of this provision.  The State has not appeared in this litigation and thus has identified neither a legitimate governmental purpose for the initiative and referendum ban nor a rational

---

[1] Initiatives and referendums are forms of direct legislation.  The initiative allows voters to petition to propose a law that is then adopted or rejected by voters at the polls.  The referendum serves as a check on government.  It allows voters to petition to refer a legislative action to voters for approval or disapproval at the polls.  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2660 (2015) (quotation omitted).

relationship between any such purpose and singling out of Greensboro voters.  No legitimate purpose or rational relationship appears in the undisputed evidence.  The Court, having converted the motion to one for partial summary judgment and upon an expansion of the record, will grant the motion.

## I.    BACKGROUND AND UNDISPUTED FACTS

### A.    North Carolina Law on Municipal Elections

Under the North Carolina Constitution, cities and counties are essentially creatures of the state.[2]  Article VII gives the General Assembly the power to "provide for the organization and government and the fixing of boundaries of counties, cities and towns."[3] "[M]unicipalities have no inherent powers; they have only such powers as are delegated to them by legislative enactment."[4]

In 1969, the General Assembly adopted the statute now codified at N.C. Gen. Stat. §§ 160A-101 to -111, which delegates significant control to all cities over their forms of government.[5]  Under Chapter 160A, every North Carolina municipality and its voters have the right to select the structure and form of the municipality's government.[6]  Section

---

[2] *See* N.C. Const. art. VII, § 1.

[3] *Id.*

[4] *City of Asheville v. State*, 192 N.C. App. 1, 20, 665 S.E.2d 103, 119 (2008) (quoting *In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 16-17, 249 S.E.2d 698, 707 (1978)).  For a history of municipal elections in North Carolina, *see* Robert Joyce, *Municipal Elections–Odd Year and Odd Man Out*, Coates' Canons: NC Local Government Law (July 7, 2015), http://canons.sog.unc.edu/municipal-elections-odd-year-and-odd-man-out/ [https://web.archive.org/web/20170323183025/https://canons.sog.unc.edu/municipal-elections-odd-year-and-odd-man-out/].

[5] *See* 1969 N.C. Sess. Laws 629.

[6] *See generally* N.C. Gen. Stat. § 160A-101 to -111 (2016).

160A-101 allows every municipality to choose the style of the municipal corporation and its governing board;[7] the number, terms of office, and mode of election of council members;[8] the method of conducting municipal elections;[9] the method of choosing the mayor;[10] and the form (mayor-council or council-manager) of municipal government.[11] It also requires that city councils draw the boundaries of any districts and divide council seats between the districts and at-large seats, if any.[12]

Each city council is authorized to change between and among options identified in § 160A-101 by adopting an ordinance amending the city's charter, subject to notice and procedural requirements.[13]  Councils can, if they choose, require approval by the people before adopting the ordinance.[14]

If a city council enacts such a change without approval by a vote of the people, public notice is required[15] and the change is subject to a referendum if the required number of voters submit a timely petition.[16]  If a petition meeting the numerical requirements is presented to the council within thirty days of public notice, the council must submit its proposed change to a referendum before it can go into effect.[17]

---

[7] *Id.* § 160A-101(2)-(3).
[8] *Id.* § 160A-101(4)-(6).
[9] *Id.* § 160A-101(7).
[10] *Id.* § 160A-101(8).
[11] *Id.* § 160A-101(9).
[12] *Id*. § 160A-101(6).
[13] *Id.* § 160A-102.
[14] *Id.*
[15] *Id.*
[16] *Id.* § 160A-103.
[17] *Id.*

3

Each city's municipal voters can also change city governance by initiative.[18]
There are procedural requirements, but an initiative can cover any topic in § 160A-101
except for drawing district boundaries.[19]  After receiving an initiative petition, the council
must call a special election to consider the proposed change.[20]

Since 1983, Greensboro has chosen, pursuant to Chapter 160A, to use the mayor-
council form of government, with the mayor and three council members elected at-large
and five council members elected from single-member districts.[21]  At the time the
General Assembly passed the legislation at issue here, all council members and the mayor
were elected to two-year terms.[22]

### B.      Session Law 2015-138

In early July 2015, days before the filing period for the 2015 Greensboro City
Council election was scheduled to open,[23] the North Carolina General Assembly passed
Session Law 2015-138, referenced here as "the Act."[24]  The Act made many changes to
the way the Greensboro City Council would be elected in 2015 and to the city's
governance structure going forward.

---

[18] *Id.* § 160A-104.
[19] *See id.* § 160A-101(6).
[20] *Id.* § 160A-104.
[21] *See* Doc. 34 at ¶ 7.
[22] *See id.* at ¶¶ 2, 8.
[23] *See* Doc. 11 at ¶ 7.
[24] 2015 N.C. Sess. Laws 138, *available at* Doc. 1-1 at p. 10.  The Act is titled "An Act to
Modify the Form of Government in the City of Trinity and to Clarify the Form of Government,
Method of Election, and Determination of Election Results in the City of Greensboro."  *Id.*  This
lawsuit does not challenge Section One of the Act, which "applies only to the City of Trinity."
*Id.* at sec. 1.(c).  Parts of Section 2 of the Act would have been codified at Greensboro, N.C.,
Charter ch. III, subch. A § 3.01, subch. B § 3.23(b), subch. E § 3.81.

4

As is relevant to the pending motion, the Act prohibits Greensboro voters from making changes to the form of city government by initiative or referendum.[25] At the time the Act was passed, one referendum, initiated by the Greensboro City Council, was scheduled for Fall 2015; the issue was whether to increase council member terms from two years to four years.[26] The original Act had had no expiration date on the prohibition of changes by its citizens.[27] In late September 2015, as part of a "technical corrections" bill, the General Assembly amended the Act to prohibit alterations and amendments to the City of Greensboro's form of government only "until after the return of the 2020 federal decennial Census."[28]

### C.    Litigation History

The plaintiffs, including the City of Greensboro and several Greensboro citizens, filed this lawsuit on July 13, 2015, alleging that the Act violated the equal protection clauses of the United States and North Carolina Constitutions in two ways, including the prohibition on initiative and referendum petitions.[29] In addition to seeking preliminary injunctive relief,[30] the plaintiffs sought to permanently enjoin the implementation of the

---

[25] Doc. 1-1 at sec. 2.(b) ("Notwithstanding Part 4 of Article 5 of Chapter 160A of the General Statutes . . . , the City of Greensboro shall not alter or amend the form of government for the City."). While the Act does not mention referendums or initiatives, it states unequivocally that no changes are allowed. This cannot be read to allow any referendum or initiative petitions under N.C. Gen. Stat. §§ 160A-103 or -104, because the purpose of those petitions is to make such changes. In any event, those petitions require action by a city council to be implemented. *See id.* §§ 160A-103, -104.

[26] Doc. 34 at ¶ 8.

[27] *See* Doc. 1-1 at sec. 2.(b).

[28] *See* 2015 N.C. Sess. Laws 264 sec. 85.5, *available at* Doc. 49-1 at sec. 85.5 & p. 41.

[29] Doc. 1 at 22, 23.

[30] Docs. 3, 7.

5

Act as unconstitutional, restore the previously existing election procedures, and recover attorney's fees.[31]

On July 23, 2015, after notice to the defendant Guilford County Board of Elections and the Attorney General and after a hearing, the Court entered a preliminary injunction that enjoined the Board from implementing elections according to the Act.[32] The plaintiffs filed an initial amended complaint in February 2016, adding a third equal protection claim based on racial gerrymandering.[33]

The sole defendant here, the Board, has indicated that it has only a "ministerial" role in elections and that taking a position on the constitutional issues raised would be inconsistent with its duty to administer elections in an impartial and nonpartisan manner.[34] The Board has not defended the Act, though it has participated in the litigation in other ways.[35]

Before the hearing on the motion for preliminary injunction, the Attorney General was given notice of this lawsuit pursuant to state law.[36] The Attorney General decided not

---

[31] Doc. 1 at p. 25 ¶¶ a, d, f.

[32] Doc. 36 at 1, 3. Consistent with the preliminary injunction, the 2015 Greensboro City Council elections took place under the preexisting district plan and municipal system. Voters approved a referendum to increase council members' terms from two years to four years; as noted *supra* p. 5, this referendum was already scheduled to appear on the ballot when the General Assembly passed the Act. *See* Greensboro, N.C., Charter ch. III, subch. A, § 3.01 (2017) (as amended by Ord. No. 15-0151 (Dec. 15, 2015)); Doc. 110-1 at ¶ 12.

[33] *See* Doc. 65 at 25-26.

[34] Doc. 100-1 at 4-5; *see also* Doc. 27 at 5 (discussing the problems the Board would create if it "took a stand, any stand, on the underlying constitutionality issue and this Court ruled otherwise").

[35] *See, e.g.*, Doc. 27 (responding to motion for temporary restraining order and preliminary injunction); Doc. 123 at 46 (agreeing to joint stipulations of fact between the parties).

[36] Doc. 31-2 at 2; *see also* Doc. 23 at 2; Doc. 24 at 10.

6

to participate in the litigation,[37] and no one from the attorney general's office appeared at the preliminary injunction hearing,[38] submitted evidence, or filed a brief in opposition to an injunction. Since the preliminary injunction, the Attorney General has not substantively participated in this litigation[39] and has not defended the Act.[40] Legislative leaders within the General Assembly appear to have standing to intervene, but have not asked to do so.[41]

In August 2015, just a few weeks after the Court issued the injunction, several Greensboro residents moved to intervene as defendants in support of the Act,[42] and the Court allowed them to intervene soon thereafter.[43] The intervenors participated in discovery,[44] and filed a motion to dismiss for failure to join a necessary party.[45] The Court denied that motion pursuant to *Wright v. North Carolina*.[46] The intervenors did not

---

[37] Doc. 31-2 at 3.

[38] *See* Minute Entry 07/23/2015.

[39] The attorney general's office has represented legislators and legislative staff in connection with subpoenas, but it has not made arguments on any substantive issues. *See, e.g.*, Doc. 76-1 ("I am appearing solely for the limited purpose of responding to matters related to plaintiffs' subpoenas . . . .").

[40] *See* Doc. 49-2.

[41] N.C. Gen. Stat. § 1-72.2 (2016) (stating that the speaker of the house and president pro tempore of the senate have standing to intervene on behalf of the General Assembly "in any judicial proceeding challenging a North Carolina statute"). The statute does not provide a mechanism or requirement for any formal notice to the speaker or president pro tem. Here, the record is replete with exhibits showing that both the speaker and the president pro tem have known about the lawsuit for months. *See, e.g.,* Doc. 74-1 at 50 (subpoenaing documents from speaker); Pl.'s Ex. 230 (email to president pro tem from City Attorney attaching preliminary injunction).

[42] Doc. 37; *see* Doc. 37-2 at 2.

[43] Doc. 53.

[44] *See* Doc. 56.

[45] Doc. 61.

[46] 787 F.3d 256 (4th Cir. 2015); Doc. 72.

7

file any summary judgment motions or respond to the pending dispositive motion.[47]  The

Court ultimately allowed them to withdraw in late 2016 at their request.[48]

With the Court's permission, the plaintiffs filed a second amended complaint on

December 8, 2016.[49]  This complaint substituted one of the individual plaintiffs and

included no substantive changes.[50]  The Board filed an updated answer on December 22,

which made no substantive changes from its earlier answers.[51]

## II.    THE PENDING MOTION

### A.  Procedural Background

On October 21, 2016, the plaintiffs jointly filed a motion for partial judgment on

the pleadings.[52]  The plaintiffs sought judgment in their favor on their first claim for

relief,[53] which alleged that the Act violated the Equal Protection Clause by depriving the

citizens of Greensboro of the statutory right to seek an initiative or referendum, which

remained available to the citizens of every other municipality in the state.[54]  The Board

filed a response indicating that it would not dispute the merits of this claim.[55]  The

defendant-intervenors did not respond to the motion and withdrew from the case six

weeks after the motion for judgment on the pleadings was filed.[56]

---

[47] Doc. 103 at ¶ 4.
[48] Doc. 103; Text Order 12/07/2016.
[49] Docs. 108, 109.
[50] Doc. 104 at ¶¶ 6, 8.
[51] *See* Doc. 112.
[52] Doc. 95.
[53] *See id.* at ¶ 3.
[54] Doc. 1 at ¶¶ 66-73; Doc. 109 at ¶¶ 76-83.
[55] Doc. 100-1 at 6.
[56] *See* Text Order 12/07/2016.

At a hearing on December 13, 2016, the Court converted the motion to a motion for partial summary judgment, without objection from the parties, and it held the motion open for submission of evidence.[57]  The plaintiffs presented additional evidence in accordance with Federal Rule of Civil Procedure 12(d).[58]  The parties agreed that additional briefing was not required.[59]  Consistent with the standard in Rule 56, the Court views the evidence in the light most favorable to the defendant.[60]

### B. Merits

#### 1. Legal Context

"[I]f a state chooses to confer the right of referendum to its citizens, it is 'obligated to do so in a manner consistent with the Constitution.'"  *Molinari v. Bloomberg,* 564 F.3d 587, 597 (2d Cir. 2009) (quoting *Meyer v. Grant*, 486 U.S. 414, 420 (1988)).  Similarly, if the state creates an initiative procedure, it cannot restrict the use of that procedure in a way that violates the Constitution.  *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993).

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The clause "does not take from the States all power of classification," *Pers. Adm'r v. Feeney*, 442 U.S. 256, 271 (1979), but "keeps governmental decisionmakers from treating differently persons who are in all relevant

---

[57] *See* Minute Entry 12/13/2016; Doc. 124 at 21:10-:12, 25:24-26:21.
[58] *See* Doc. 110-1 to -6.
[59] *See* Doc. 124 at 26:22-27:4.
[60] *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 301 (4th Cir. 1998) (per curiam).

respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

"[T]he Equal Protection Clause of Article I, § 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." *White v. Pate*, 308 N.C. 759, 765, 304 S.E.2d 199, 203 (1983). The North Carolina Constitution also provides the same "equal right to vote" guaranteed by the United States Constitution. *Id.* at 769, 304 S.E.2d at 205.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If the plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

"Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)). "By requiring that the classification bear a rational relationship to an independent and

10

legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633. The rational basis test is admittedly a low bar; nonetheless, laws that do not pass this test are unconstitutional. *See, e.g.*, *id.* at 635. *See generally City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985) (holding that zoning ordinance based on "an irrational prejudice against the mentally retarded" failed rational basis review); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (holding that "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

While territorial uniformity is not a constitutional requirement of the equal protection clause, *Salsburg v. Maryland*, 346 U.S. 545, 552 (1954), a territorial distinction must rationally serve a legitimate governmental interest. *See id.* at 553-54 (noting state's reasonable explanation for treating defendants in one county differently from defendants in other counties); *Francis v. Maryland*, 605 F.2d 747, 749-50 (4th Cir. 1979) (rejecting equal protection challenge to different treatment of juvenile defendants in one county based on finding of legislative "experimental purpose," and distinguishing *Long v. Robinson*, 316 F. Supp. 22 (D. Md. 1970), *aff'd*, 436 F.2d 1116 (4th Cir. 1971), where "no rational basis could be found" for treating juveniles in one city as adults, a "harsh exception" to the way juveniles were treated elsewhere in the state).

There is no fundamental right to vote in an initiative or referendum. *See Kendall v. Balcerzak,* 650 F.3d 515, 522 (4th Cir. 2011). The plaintiffs here do not contend that

11

they are members of a suspect class. As the plaintiffs agree, the initiative and referendum prohibition in the Act is subject to this "rational basis" level of scrutiny.[61]

### 2. Undisputed Evidence

The Act prohibits the City of Greensboro from changing the form of its municipal government.[62] This prohibition necessarily includes a prohibition on citizen initiatives and referendums that would change the form of city government.[63] By its express terms, this part of the Act applies "only to the City of Greensboro" and to no other municipality.[64] The Act itself does not contain any findings of fact, any statement about the reason the Act was needed, or any explanation for its enactment beyond its title, which indicates it is "An Act . . . to Clarify" the form of Greensboro's elections and municipal government.[65]

The legislative history that exists for the Act does not provide any justification for the Act's removal of initiative and referendum rights from the voters of Greensboro. While several versions of the Act were discussed by a Senate committee and by the House and Senate during floor debates, no legislator addressed the ban on initiatives and referendums or stated any reason to deny the citizens of Greensboro the right to bring

---

[61] *See* Doc. 96 at 9-10. The "equal protection clause guarantees not only 'the initial allocation of the franchise'—that is, the right to vote," but also applies "to the manner of its exercise." *Wright*, 787 F.3d at 263 (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)) (interpreting an equal protection claim based on the one-person, one-vote principle).
[62] Doc. 1-1 at sec. 2.(b).
[63] *See supra* n.25.
[64] Doc. 1-1 at sec. 2.(g).
[65] *See* Doc. 1-1.

these petitions on the same terms as citizens of other cities.[66]  At least one opponent of the Act explicitly objected to the lack of explanation for the removal of initiative rights, asked why Greensboro was being "singled out for this treatment," and raised equal protection concerns.[67]

To be sure, the legislature thoroughly discussed whether it should put the changes proposed in the Act before the citizens in the form of a referendum.  In public comments, many citizens asked for a referendum.[68]  Legislators discussed a referendum[69] and twice voted to stop amendments that would have put the changes to a referendum.[70]  Those discussions, however, were about a potential referendum on whether the changes to the form of the City Council in the Act itself would become law, not the background provisions of §§ 160A-103 and -104 allowing citizens to petition for initiatives and referendums on other matters.  The discussion in the legislature covered all other parts of the bill: the redistricting, the removal of the right to vote from the mayor, the increase of terms to four years, and the removal of the right of the City Council to change the districts or to submit the new districts to a referendum.[71]

---

[66] *See generally* Docs. 110-4, 110-5.

[67] Doc. 110-4 at 19:5-20:9.

[68] *E.g.*, *id.* at 18:13-:16, 30:5-:14, 68:3-:6.

[69] *E.g.*, *id.* at 102:18-104:2; Doc. 110-5 at 30:4-:7, 44:11-:21, 66:17-67:5.

[70] Doc. 110-4 at 109:8-111:7 (committee rejecting amendment), 138:18-141:12 (full senate tabling an amendment).

[71] *See, e.g.*, *id.* at 48:20-:23 (public comment on four-year terms), 113:24-114:8 (discussing decision not to submit changes to a referendum), 132:9-134:14 (summarizing changes in bill, including four-year terms), 150:22-152:25 (discussing new districts and effect on communities of interest), 161:11-162:4 (discussing changes to mayor's role), 173:3-174:1 (discussing effect on voting power of black communities); Doc. 110-5 at 40:11-44:21 (discussing redistricting and lack of required referendum), 66:17-67:5 (discussing lack of required referendum).

13

While the General Assembly has redistricted and reapportioned other cities and boards from time to time, nothing before the Court indicates that the General Assembly has ever before prohibited an existing municipality's voters from participating in the referendums and initiatives described in §§ 160A-103 and -104. The same law at issue here also changed the government of the City of Trinity, but the General Assembly did not prohibit the citizens of that city from using initiatives or referendums.[72] The only other similar 2015 session law, which changed the City of Albemarle's election procedures, did not deprive those citizens of their initiative or referendum rights, either.[73]

The intervenors' amended answer suggests "that other municipalities are similarly situated with regard to a delayed referendum in North Carolina."[74] The intervenors withdrew without providing any evidence in support of this statement, and there is no evidence in the record to support it.

The plaintiffs advise the Court that they undertook a substantial search and review of North Carolina statutes related to municipal elections[75] and found only one time where the legislature prohibited the citizens of an entity similar to a municipality from seeking initiatives or referendums.[76] That lone exception was a 2003 session law prohibiting

---

[72] *See* Doc. 1-1 at sec. 1.
[73] *See* 2015 N.C. Sess. Laws 253 sec. 1.(b) (setting four-year terms for all of Albemarle's city council members and mayor and aligning those elections with the dates for elections for statewide offices, but leaving initiative and referendum procedures unaffected).
[74] Doc. 69 at ¶ 79.
[75] Doc. 124 at 11:1-14:5.
[76] *See* Doc. 110-6.

14

Butner from using initiatives or referendums to change its form of government.[77]  Butner was a unique case because, while it was called a "town," it was not incorporated as a town at the time and was instead managed by the state.[78]  The 2003 law in question merely created a new "advisory council" for Butner.

In other situations identified by the plaintiffs, such as session laws that incorporated new towns, the General Assembly adjusted the percentage of voters needed to sign a petition to put an initiative or referendum on the ballot.[79]  Unlike Greensboro citizens, the citizens of these municipalities were not wholly barred from conducting referendums or initiatives for any period of time.

### 3.  Analysis

The text of the Act establishes that the legislature intended that the provisions of the Act at issue here would apply to—and only to—the citizens of Greensboro.  The title of the Act refers to Greensboro's elections and municipal government.[80]  The text states that Section Two "applies only to the City of Greensboro."[81]  The legislature has never deprived the citizens of any other municipality of their initiative and referendum rights, and it did not deprive citizens of Albemarle or Trinity of their referendum rights when it changed their municipal governments in the same year it changed Greensboro's

---

[77] *Id.* at 6; *see* 2003 N.C. Sess. Laws 346 sec. 1 ("Part 4 of Article 5 of Chapter 160A of the General Statutes does not apply to Butner.").

[78] *See generally* 2007 N.C. Sess. Laws 269 sec. 1 (later, incorporating the Town of Butner).

[79] Doc. 110-6 at 4-5; *see, e.g.*, 2011 N.C. Sess. Laws 166 sec. 1 (enacting §§ 8.2(b), 8.3), *available at* Doc. 110-6 at 9-13.

[80] Doc. 1-1 at p. 2.

[81] *Id.* at sec. 2.(g).

15

municipal government.[82]  It is undisputed that the Act treats the individual citizens of the City of Greensboro differently from all other municipal citizens in the state and from all other citizens whose municipal governance was changed in 2015.

The Act intentionally withdraws statutory referendum and initiative rights from voters in Greensboro, alone among municipal citizens in North Carolina.  Consequently, it cannot survive constitutional scrutiny unless there is a rational basis for distinguishing between Greensboro and other North Carolina municipalities, and between Greensboro and the two other municipalities whose governance structures were changed in 2015.[83] The crux of the motion is whether there is evidence of a legitimate governmental purpose behind this different treatment and whether there is a rational relationship between the Act and any such purpose.[84]  The Court places the burden on the plaintiffs to prove the absence of these things.[85]

---

[82] *Supra* pp. 14-15.

[83] *See Save Palisade FruitLands v. Todd,* 279 F.3d 1204, 1213-14 (10th Cir. 2002).

[84] *See Veney*, 293 F.3d at 731 (quoting *Heller*, 509 U.S. at 319-20).

[85] In other equal protection contexts, the Supreme Court has noted that a state "has no obligation to produce evidence to sustain the rationality of a statutory classification."  *Heller*, 509 U.S. at 320 (upholding state's differing procedural standards between two types of involuntary commitment proceedings).  Similarly, the Court has observed that a legislature need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, 505 U.S. at 15 (upholding classifications in tax rates).  It has also held in an economic regulation case that "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'"  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  This Court assumes without deciding that these rules would apply in a case where the legislature deprives one group of citizens of voting rights available to all other similarly-situated citizens in the state and where the state chooses not to defend the Act.  The Court thus places the burden on the plaintiffs to show a lack of any legitimate state purpose and lack of any rational relationship.  As noted *supra* p. 9, the Court views the evidence in the light most favorable to the defendant for purposes of this summary judgment motion.

16

There is no direct evidence or affirmative suggestion of a legitimate governmental purpose or of a rational relationship between the Act and any such purpose. The Board has offered no evidence or suggestion of a legitimate governmental purpose or rational basis for the initiative and referendum prohibition,[86] nor did the intervenors.[87] The Act itself and the transcripts of the legislative debates proffered by the plaintiffs are silent as to the reasons for the initiative and referendum prohibition.[88] No legislator or supporter of the Act has testified about a reason for banning citizen-initiated petitions in Greensboro.[89]

Nor is there any indirect or circumstantial evidence suggesting a legitimate governmental purpose or any rational reason for singling out Greensboro. The historical evidence proffered by the plaintiffs of legislation about referendums and initiatives does not raise any legitimate state purpose for treating Greensboro citizens differently from citizens of all other cities in the state,[90] nor is there any suggested historical or factual reason on record for such different treatment. Even if the State had a legitimate interest in prohibiting initiatives and referendums by Greensboro citizens, there is nothing tending to distinguish the citizens of Greensboro from those of Trinity or Albemarle.[91]

---

[86] *See* Doc. 100-1.

[87] *See* Doc. 69; Doc. 103 at ¶ 2 (stating that defense of the Act "would be futile").

[88] *See supra* pp. 12-14.

[89] *See supra* pp. 6-8.

[90] *See* Doc. 110-6.

[91] *See Francis*, 605 F.2d at 748 (holding that geographic differences in law are constitutional if the differences "serve some state interest"); *cf. Walker v. Exeter Region Coop. Sch. Dist.*, 284 F.3d 42, 46 (1st Cir. 2002) (finding a rational basis for different requirements for school board referendums between different counties, based on whether the counties used town meetings or ballot initiatives as their form of government).

Finally, the Court has been unable to identify any obvious legitimate governmental interest for the Act's discriminatory treatment of Greensboro citizens. While one can imagine factual situations in which the legislature might have a rational basis for depriving one municipality's voters of the initiative and referendum rights available to voters in all other municipalities, such as a desire to experiment or a need for reform, these hypothetical factual situations do not exist in this case.[92] No other purposes are apparent.[93]

---

[92] *White,* 308 N.C. at 769-70, 304 S.E.2d at 206 (identifying the "need to experiment" in "the science of government" as a rational basis for classification at issue); *McGowan v. Maryland,* 366 U.S. 420, 425-26 & n.3 (1961) (discussing reform as a legitimate governmental interest, even where the reform occurs in piecemeal manner). Here, however, the legislature imposed a traditional system without any new or unusual provisions. Winston-Salem, for instance, also elects city council members from single-member wards and uses the council-manager system of government. *See* Winston-Salem, N.C., Charter art. II, § 12A(2); Winston-Salem, N.C. Code of Ordinances ch. 2, art. IV, § 2-317. There is also no suggestion in the record of a need for reform in Greensboro that is distinguishable from any need for reform in Albemarle or Trinity.

[93] The plaintiffs have a high burden of proof. *See supra* n.85. In light of this burden of proof and the summary judgment standard, the Court has reviewed the record, including the legislative history and transcripts of legislative debate, for any obvious reason for the different treatment of Greensboro voters. This burden of proof does not mean, however, that the Court should act as an advocate for the constitutionality of the Act. *Cf. Walker v. Prince George's Cty.*, 575 F.3d 426, 429 n.* (4th Cir. 2009) (noting that courts do not make arguments for the litigants); *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (noting that courts do not "scour the record in search of evidence to defeat a motion for summary judgment" (quotation omitted)); *Hughes v. B/E Aerospace, Inc.*, No. 1:12cv717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (stating that courts do not undertake the work that a litigant "elected not to do"). The Supreme Court's use of the words "conceivable" in *Beach Communications,* 508 U.S. at 313-15, and "conceived" in *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802, 809 (1969), cannot mean that courts must act as an advocate or abandon their traditional role as impartial arbiter. *Cf. Mistretta v. United States*, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality . . ."); *United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995) (noting court's duty to conduct jury trial in an atmosphere of impartiality).

18

The result in *Palisade* supports this conclusion.[94] In that case, the court held that there was no equal protection violation in a Colorado statutory system that gave initiative rights to voters of some counties and not to others.[95] There, however, any county could obtain the "home rule" status that enabled initiatives and referendums by obtaining voter approval of a home rule charter.[96] That is not the case here, where the Act uniquely isolates Greensboro voters and provides no mechanism for restoring referendum and initiative rights before 2020. Moreover, the legitimate interests advanced by the statute at issue in *Palisade* were to "facilitat[e] a broader degree of powers [by counties] and enhanc[e] local autonomy."[97] Those interests are not met here by depriving Greensboro voters alone of referendum and initiative rights.

This case is also unlike *Republican Party of Pennsylvania v. Cortés*,[98] where the plaintiffs did not show a likelihood of success on their equal protection challenge to a requirement that poll workers live in the county where they served. In that case, the state had "enacted a county-based scheme to manage elections within the state, and consistent with that scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process, including in credentialing poll watchers."[99] The residency restriction was applied statewide and was "rationally

---

[94] *See Palisade,* 279 F.3d at 1213-14.
[95] *Id.* at 1214.
[96] *Id.* at 1208.
[97] *Id.* at 1214.
[98] No. 16-05524, 2016 WL 6525409, at *7 (E.D. Pa. Nov. 3, 2016).
[99] *Id.*

related to the state's interest in maintaining its county-run election system."[100]  Unlike in *Cortés*, the General Assembly's prohibition on referendums and initiatives in Greensboro does not fit into the larger statutory scheme within which the prohibition functions.  If anything, the prohibition goes against that scheme, which largely allows for local control over municipal governance.[101]  The *Cortes* court noted that the "policy decision" behind the county-based residency restriction was "entirely rational in fashioning a scheme for a state as large as Pennsylvania."[102]  Here, no such policy decision is apparent.

The plaintiffs have produced all available evidence of the Act's legislative history and have directed the Court's attention to the laws enacted over the past several decades in which the legislature has addressed referendum and initiative rights.  No legitimate state purpose for treating citizens of Greensboro differently has been offered or appears on the record.  The plaintiffs have met their burden of showing that the state had no legitimate governmental interest in prohibiting Greensboro citizens from exercising referendum and initiative rights available to all other municipal citizens, including citizens of other municipalities that have been redistricted and reorganized by the state.

## III.    CONCLUSION

A classification system "must find some footing in the realities of the subject addressed by the legislation."[103]  A law not "directed to any identifiable legitimate

---

[100] *Id.*
[101] *See supra* pp. 2-4.
[102] 2016 WL 6525409, at *7.
[103] *Heller*, 509 U.S. at 321.

20

purpose or discrete objective" is "something the Equal Protection Clause does not permit."[104]  The plaintiffs have produced undisputed evidence of all material facts:  The Act's revocation of referendum and initiative rights from the citizens of Greensboro (1) intentionally treats Greensboro voters differently from all other municipal citizens in the state and from the citizens of Trinity and Albemarle; and (2) is not directed or rationally related to any identifiable legitimate governmental purpose.  The initiative and referendum prohibition violates the Equal Protection Clause and the Court will grant the plaintiffs' motion for summary judgment.

The Court will address the remedy for this violation in the Court's opinion resolving the plaintiffs' other claims, which were presented at a trial in February.  That opinion and a judgment will be entered shortly.

It is **ORDERED** that the plaintiffs' joint motion for partial summary judgment as to Count I of the second amended complaint, Doc. 95, is **GRANTED**.

This the 3rd day of April, 2017.

UNITED STATES DISTRICT JUDGE

---

[104] *Romer*, 517 U.S. at 635; *see also City of Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534.

Case 1:15-cv-00559-CCE-JLW   Document 135   Filed 04/03/17   Page 21 of 21